*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0333p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

ALBERT J. KAPPELL,

        *Defendant-Appellant.*

No. 04-1333

---

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 03-00002—Gordon J. Quist, District Judge.

Argued: March 9, 2005

Decided and Filed: August 9, 2005

Before: MARTIN, GILMAN, and FRIEDMAN, Circuit Judges.[*]

---

## COUNSEL

**ARGUED:** Paul L. Nelson, FEDERAL PUBLIC DEFENDERS OFFICE, Grand Rapids, Michigan, for Appellant. Michael A. MacDonald, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Paul L. Nelson, FEDERAL PUBLIC DEFENDERS OFFICE, Grand Rapids, Michigan, for Appellant. Michael A. MacDonald, Leslie A. Hagen, ASSISTANT UNITED STATES ATTORNEY, Grand Rapids, Michigan, for Appellee.

---

## OPINION

---

FRIEDMAN, Senior Circuit Judge. Albert J. Kappell appeals from his jury conviction and sentence on multiple counts of child sexual abuse in violation of 18 U.S.C. §§ 2241(c) and 2244. He contends that his trial violated his Sixth Amendment right to confront the witnesses against him (the victims of the abuse), that the district court erroneously admitted the testimony of a licensed psychotherapist reporting what the victims had said in interviews with her, and that the evidence was insufficient to support his convictions. He also challenges his sentence of life imprisonment under § 2241(c) based on his prior state conviction for child sexual abuse. We reject all of his contentions, and **AFFIRM** his conviction and sentence.

---

[*] The Honorable Daniel M. Friedman, Senior Circuit Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

I

A.   Kappell was convicted by a jury in the United States District Court for the Western District of Michigan of nine counts of child sexual abuse in violation of 18 U.S.C. §§ 2241(c) and 2244, based on his abuse of two minor female children ("the children"), who are members of the Keweenaw Bay Indian Community.  When the abuse began, the children were six and three years old and were living on an Indian reservation with their mother and grandmother.  In early 2001, Kappell began a relationship with the mother and moved into the family's home on the reservation.  He lived there until April 2002, when he was compelled to leave after the children's mother learned that he had been convicted of felony child sexual abuse by the state of Wisconsin in 1982.  The victims in that case were the nine- and ten-year-old daughters of his former fiancee.

In the spring of 2002, state and tribal social workers learned of Kappell's Wisconsin conviction and became concerned because he had been living with the children for some time.  A medical clinic nurse who had spoken with the children's mother made a mandatory child sexual abuse referral to the social services department.  As a result, the children were interviewed several times by tribal and state social workers.  The children gave verbal and nonverbal interview responses indicating that Kappell might have sexually abused them.

In May 2002, the tribe and the state agency referred the children to Fran Waters for further evaluation.  Waters is a licensed psychotherapist and state-certified clinical social worker specializing in child sexual abuse.  Waters interviewed each child several times, following a "forensic interview" protocol of the State of Michigan for interviewing children who may have been sexually abused.  Waters testified that these interviews were needed to obtain the information necessary for an accurate medical diagnosis before seeking mental health treatment for the children.

According to Waters, both children made verbal disclosures of various incidents of sexual abuse by Kappell, and also reacted nonverbally in ways suggesting that they had been sexually abused.  Waters also testified that the older child had described seeing Kappell sexually abuse the younger one.  Waters testified that, based on her interviews, she concluded that both children were suffering from post-traumatic stress disorder, and recommended to the tribal social worker that both children receive mental health therapy.  Waters herself did not provide therapy to the children.

During 2002, the children were examined by two pediatric physicians.  Both doctors testified about the children's verbal and nonverbal responses to questions about sexual abuse.  According to the doctors' testimony, the older girl described incidents of sexual abuse by Kappell to one doctor, confirmed abuse by Kappell to the other doctor by nodding, and became emotional in the presence of each doctor when the subject was discussed.

B.  The indictment charged Kappell with seven counts of aggravated sexual abuse of minor children, in violation of 18 U.S.C. § 2241(c), and two counts of abusive sexual contact against minor children, in violation of 18 U.S.C. § 2244.  Prior to trial, Kappell moved to exclude Waters's testimony regarding statements that the children made during the interviews.  The district court denied Kappell's motion, ruling that such statements would be admissible under Federal Rule of Evidence 803(4), the hearsay exception for "statements for purposes of medical diagnosis or treatment," and also under Rule 807, the hearsay "residual exception" for statements not specifically covered by Rules 803 or 804, but having "equivalent circumstantial guarantees of trustworthiness."  Waters and the two physicians who had examined the children testified for the prosecution at trial.

The two children, who were eight and five years old at the time of the trial, also testified.  The court determined that they feared Kappell and "would suffer emotional trauma from testifying in open court in the presence of [Kappell]."  Therefore, they testified in a room outside the courtroom and the jury viewed their testimony over closed-circuit television monitors.  Kappell did not object to this procedure.  Each child

answered many questions on both direct and cross-examination, but they often answered without providing details and were unresponsive to some questions.

At the conclusion of the government's case and again at the conclusion of trial, Kappell moved for judgment of acquittal on six of the nine counts. The district court stated that "there is little or no evidence as to what Mr. Kappell specifically did on or about certain dates with respect to these two girls individually, absent the testimony of Ms. Waters . . . . So what we're down to is can the defendant be convicted of [the six counts] based upon the testimony of Ms. Waters." The court denied Kappell's motion, ruling that "a reasonable juror could convict the defendant of these charges based upon the testimony of Ms. Waters, if it is believed by the jury."

C. After the jury verdict, the district court instructed the parties to brief the issue whether the mandatory life sentence provision of 18 U.S.C. § 2241(c) covers this case. That provision states, in pertinent part:

> If the defendant has previously been convicted of another Federal offense under this subsection, or of a State offense that would have been an offense under either such provision had the offense occurred in a Federal prison, unless the death penalty is imposed, the defendant shall be sentenced to life in prison.

*Id.*

The presentence report recommended that Kappell receive a life sentence under section 2241(c), based on his 1982 Wisconsin state conviction for child sexual abuse. Kappell objected to the report, arguing, among other things, that his Wisconsin conviction was not for an offense that section 2241(c) covered. The district court rejected Kappell's contention, and sentenced him to life imprisonment.

II

A. Kappell contends that the introduction into evidence of the two children's statements about what Kappell had done to them violated his right to confrontation under the Sixth Amendment. His challenge relates both to the children's testimony and the testimony of the psychotherapist and the two physicians regarding what the children told them. Since Kappell did not raise a Confrontation Clause argument in the district court, we review the issue (even though it is constitutional) for plain error. *See United States v. Cromer*, 389 F.3d 662, 672 (6th Cir. 2004); *United States v. Jones*, 108 F.3d 668, 676 (6th Cir. 1997). There was no plain error here.

The Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The "principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused . . . . The Sixth Amendment must be interpreted with this focus in mind." *Crawford v. Washington*, 541 U.S. 36, 50 (2004) (italics in original).

Nothing in Kappell's trial violated his rights under the Confrontation Clause. He was able to, and did, confront all of the witnesses against him. The children gave direct testimony and he cross-examined them. Although the children testified not in the courtroom but in another room and their testimony was viewed on closed circuit television, Kappell acquiesced in that arrangement. *Cf. Maryland v. Craig*, 497 U.S. 836, 840-60 (1990) (holding that a state statutory procedure that permitted "a child witness who is alleged to be the victim of child abuse" to testify against the alleged perpetrator by one-way closed circuit television did not categorically violate the Confrontation Clause). The psychotherapist and the two pediatricians testified about what the children had told them, and were also extensively and vigorously cross-examined. There was no introduction into evidence of recorded out-of-court statements made by persons who did not testify – a problem that has given rise to many Confrontation Clause decisions. *See,*

*e.g.*, *Crawford*, 541 U.S. at 57-58 (citing *Barber v. Page*, 390 U.S. 719, 722-25 (1968), and *Lilly v. Virginia*, 527 U.S. 116, 125-40 (1999)); *see also Dorchy v. Jones*, 398 F.3d 783, 791-92 (6th Cir. 2005).

Kappell argues, however, that under the Supreme Court's recent decision in *Crawford*, the trial in his case denied him his right to confrontation. That argument rests upon a misinterpretation of *Crawford.*

*Crawford* involved a Washington state conviction for stabbing a man, Lee, who allegedly had tried to rape Crawford's wife. The wife was present at the stabbing and gave a tape-recorded statement to the police. Her statement was damaging to Crawford's defense that he stabbed Lee in self-defense because he believed that Lee was about to assault him. At Crawford's trial, his wife did not testify because the state marital privilege prevented such testimony without the other spouse's consent. The prosecution introduced the wife's tape-recorded statement at Crawford's trial. The Washington Supreme Court upheld its introduction because it was trustworthy. *Crawford*, 541 U.S. at 39-42.

The United States Supreme Court reversed, holding that the introduction of the tape violated the Confrontation Clause. The Court stated and applied the following standard governing the requirements of the Confrontation Clause: "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59. The Court declined to follow its prior ruling in *Ohio v. Roberts*, 448 U.S. 56 (1980), that the Confrontation Clause does not bar admission of an unavailable witness's statement against a criminal defendant if the statement "bears adequate 'indicia of reliability'" by "fall[ing] within a firmly rooted hearsay exception" or showing "particularized guarantees of trustworthiness." *Id*. at 66; *see Crawford*, 541 U.S. at 65-68. In *Crawford*, the Court rejected "reliability" as a standard for applying the Confrontation Clause, and ruled that "testimonial" statements of a non-testifying individual are admissible only if there has been "a prior opportunity for cross-examination." 541 U.S. at 68.

*Crawford* thus involved the admissibility under the Confrontation Clause of recorded testimonial statements of a person who did not testify at the trial. The holding in *Crawford* was that such statements, regardless of their reliability, are not admissible unless the defendant was able to cross-examine their maker. In the present case, in sharp contrast, the two witnesses (the children) did testify and were cross-examined. Kappell argues, however, that because the two children were unresponsive or inarticulate at some points during their trial testimony, they should be viewed as "unavailable" witnesses, whom the defendant could not effectively cross-examine. In substance, this is an argument that the children should be treated as if they had not, in fact, testified or been cross-examined. Kappell, however, did not challenge the District Court's ruling that the children could testify.

The Supreme Court addressed this issue in *United States v. Owens*, 484 U.S. 554 (1988). *Owens* involved an adult victim of a severe beating, who suffered memory loss stemming from his head injuries and testified at trial. While hospitalized, he had identified Owens as his assailant, which identification was admitted into evidence. During the victim's cross-examination, he was unable to recall details of the attack and the identification. *Id.* at 556. The Ninth Circuit held that, under the circumstances, the introduction of the victim's testimony violated the Confrontation Clause. The Supreme Court reversed, ruling that "the Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Id*. at 559 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) and *Delaware v. Fensterer*, 474 U.S. 15, 19-20 (1985)) (emphasis in original). Kappell does not contend that his right to cross-examine the children was restricted, but only that it was not as effective as it might have been if the witnesses had been older. Under *Owens*, however, that is not enough to establish a Confrontation Clause violation.

This Court followed *Owens* in *Bugh v. Mitchell*, 329 F.3d 496 (6th Cir. 2003). Bugh was convicted in state court of raping his four-year-old daughter, Robin. Four adults testified at the trial about statements Robin had made to them regarding Bugh's sexual abuse. In addition, Robin testified and was cross-

examined. In her testimony Robin answered many questions nonverbally by moving her head or shrugging her shoulders; she also failed to respond to some questions. *Id.* at 499-505.

This Court held that, under *Owens*, Robin's testimony did not violate Bugh's rights under the Confrontation Clause. This Court stated that

> in *Owens* the [Supreme] Court clearly held that the Confrontation Clause guarantees only the opportunity for cross examination, and that the Clause is not violated by the admission of hearsay evidence when the witness's memory fails at trial. . . . While counsel's cross-examination of Robin may not have yielded the desired answers, and Robin may not have recalled the circumstances surrounding her previous statements, counsel clearly had the opportunity to expose such infirmities, by pointing out Robin's youth and lack of memory. The jury had the opportunity to observe Robin's demeanor, thus permitting the jury to draw its own conclusions regarding her credibility as a witness.

*Id*. at 508. All of these considerations are equally applicable in the present case, and lead to the conclusion that the two children's testimony did not violate the Confrontation Clause.

B. Kappell next argues that the district court erred by admitting, under the Federal Rules of Evidence, psychotherapist Waters's hearsay testimony about the children's out-of-court statements. The district court admitted this testimony pursuant to Rule 803(4), the hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment," and Rule 807, permitting admission of hearsay statements "not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness[.]"

This Court apparently has not previously decided whether Rule 803(4) covers statements made to a psychotherapist and social worker, rather than to a physician or nurse. The advisory committee note to Rule 803(4) states, however: "Under the exception, the statement need not have been made to a physician. Statements to hospital attendants, ambulance drivers, or even members of the family might be included." FED. R. EVID. 803, n. to ¶ 4. Several other circuits have recognized that the provision covers statements made to non-physicians. *See United States v. Running Horse*, 175 F.3d 635, 638 (8th Cir. 1999) (explicitly applying Rule 803(4) to a child victim's statements to a psychologist); *United States v. Tome*, 61 F.3d 1446, 1451 (10th Cir. 1995) (noting that the rule could apply to a child victim's statements to a state caseworker, if the subject matter was "reasonably pertinent" to medical diagnosis or treatment); *United States v. Yellow*, 18 F.3d 1438, 1442 (8th Cir. 1994) (stating that the rule could apply to a child victim's statements to "psychologists or trained social workers"); *Morgan v. Foretich*, 846 F.2d 941, 949-50 (4th Cir. 1988) (same, for psychologist). Furthermore, contrary to Kappell's contention, the fact that Waters did not actually treat the girls herself does not preclude application of Rule 803(4), which covers statements made to non-treating persons who provide a diagnosis. *See, e.g.*, *Gong v. Hirsch*, 913 F.2d 1269, 1274 n.4 (7th Cir. 1990). We hold that Rule 803(4) covers statements made to a psychotherapist for purposes of medical diagnosis or treatment, even though the therapist is not a physician or nurse.

The critical inquiry under Rule 803(4) in this case is whether Waters undertook her interviews for the primary purpose of medical diagnosis, rather than for some other purpose, such as determining whether to notify state authorities of suspected abuse as in *Territory of Guam v. Ignacio*, 10 F.3d 608, 613 (9th Cir. 1993); deciding whether a protective order was necessary to ensure the children's safety, as in *Tome*, 61 F.3d at 1451; or obtaining evidence, as in *United States v. Beaulieu*, 194 F.3d 918, 921 (8th Cir. 1999). The record supports the district court's finding that "there is sufficient indicia that these statements were made for the purpose of medical diagnosis or treatment . . . to be admissible under 803(4)."

Waters testified that she was hired to evaluate the children's mental health and provide a diagnosis, that she conducted her interviews for that diagnostic purpose, and that she diagnosed both children as suffering from post-traumatic stress disorder and anxiety. In response to the district court's questioning

whether she told the children that she was meeting with them for "any sort of medical purpose," Waters testified that she informed them "that it's important to tell the truth, [so] that if something happened, then you can get help for that." Although Waters's interviews produced evidence that was introduced against Kappell, the record (which includes a hearing before the district court on whether to admit Waters's testimony) does not show that developing evidence was the primary, or even a major, purpose of Waters's interviews with the girls, nor does the record undermine her testimony that the purpose of the interviews was diagnostic.

Waters testified that she emphasized to the children the importance of telling the truth, and took steps consistent with the state interviewing protocol to make sure that they understood that fact. Furthermore, as the Fourth Circuit has recognized, a young child – even one who was four years old and incompetent to testify in a sexual abuse case – has a strong motive to "make true statements for the purposes of diagnosis or treatment[.]" *Morgan*, 846 F.2d at 949. There is no evidence in the record – and Kappell has not cited any – that the children were not aware of the need to be truthful in their interviews with Waters. Kappell also had the opportunity to cross-examine the children about those interviews. *See United States v. Pacheco*, 154 F.3d 1236, 1240 (10th Cir. 1998) (holding that a child victim's statements to physicians were admissible under 803(4) where defendant presented no evidence that child did not understand the need to be truthful, and child was subject to cross-examination); *see also United States v. George*, 960 F.2d 97, 100 (9th Cir. 1992) (noting that "the age of the child and her other personal characteristics go to the weight of the hearsay statements rather than their admissibility" under Rule 803(4)).

In sum, the record supports the district court's admission of the children's out-of-court statements to Waters under the hearsay exception of Rule 803(4) because those statements were made for the purpose of medical diagnosis. Because we conclude that the children's statements to Waters were properly admitted under Rule 803(4), it is unnecessary to consider the district court's alternative holding that they also were admissible under Rule 807. *Cf. United States v. Laster*, 258 F.3d 525, 529-30 (6th Cir. 2001).

C. Kappell's contention that the evidence is insufficient to support his convictions is based on the assumption that Waters's testimony would be excluded. Our holding that her testimony was properly admitted thus eliminates the basis of Kappell's challenge to the sufficiency of the evidence. As he conceded at oral argument, if Waters's testimony was properly admitted, there were no grounds on which to challenge the sufficiency of the evidence.

### III

The remaining question is whether the district court properly sentenced Kappell to life imprisonment under 18 U.S.C. § 2241(c), based on his prior state conviction for child sex abuse. Section 2241(c) covers "knowingly engag[ing] in a sexual act with another person who has not attained the age of 12 years, or attempt[ing] to do so[.]" "Sexual act" is defined under 18 U.S.C. § 2246(2) as various forms of skin-to-skin sexual contact that are explicitly described in the statute, but need not be repeated here. Section 2241(c) also contains a sentence enhancement provision that triggers a mandatory life sentence (unless the death penalty is imposed) "if the defendant has previously been convicted of another Federal offense under this subsection, or of a State offense that would have been an offense under either such provision had the offense occurred in a Federal prison[.]" *Id.*

Kappell previously had been convicted, on his plea of no contest in a Wisconsin state court, of child sexual abuse. The district court, relying on the judicial records of Kappell's state conviction, held that Kappell's conduct reflected in those records would have constituted an offense under section 2241(c). Those state judicial records included the criminal complaint, which contained facts reported by investigating officers, and the transcript of the plea hearing at which Kappell, speaking through his lawyer, stipulated that the facts recited in the complaint were correct for purposes of entering his plea. The record in this case also includes the district court trial testimony of the two victims of Kappell's Wisconsin crime, now in their early thirties, describing what he had done to them when they were children.

Kappell argues that the court's consideration of the plea transcript and the criminal complaint was impermissible under *Taylor v. United States*, 495 U.S. 575 (1990), and *Shepard v. United States*, ___ U.S. ____, 125 S. Ct. 1254 (2005). *Taylor* involved the sentencing enhancement provisions of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e) (2000). That Act requires that a previously convicted felon who is convicted of possessing a firearm receive an enhanced mandatory minimum sentence if he has three previous "violent felony" convictions. 18 U.S.C. § 924(e)(1). "Violent felony" is defined to include "burglary." 18 U.S.C. § 924(e)(2)(B)(ii). Many states had expanded the crime of burglary, which common law had defined as "the breaking and entering of the dwelling house of another in the nighttime with the intent to commit a felony." *Taylor*, 495 U.S. at 580 n.3. For example, some states had defined the crime to include invasions of structures other than "dwelling house[s]," such as automobiles, boats and vending machines, and did not limit it to invasions at night. *Id.* at 578 n.1, 591-93.

The question therefore arose as to what state burglary crimes constituted burglary under section 924(e). The Eighth Circuit in *Taylor* construed "burglary" under the federal statute to mean "'burglary' however a state chooses to define it[.]" *Id.* at 579. The Supreme Court rejected that interpretation and ruled that "Congress meant by 'burglary' the generic sense in which the term is now used in the criminal codes of most States," which "contains at least the following elements: an unlawful or unprivileged entry into, or remaining in, a building or other structure, with intent to commit a crime." *Id.* at 598 (citations and footnote omitted). The court "conclude[d] that a person has been convicted of burglary for purposes of a § 924(e) enhancement if he is convicted of any crime, regardless of its exact definition or label, having the basic elements of unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Id.* at 599.

The Court then considered "the problem of applying this conclusion to cases in which the state statute under which a defendant is convicted varies from the generic definition of 'burglary.'" *Id.* It "h[e]ld that an offense constitutes 'burglary' for purposes of a § 924(e) sentence enhancement if either its statutory definition substantially corresponds to 'generic' burglary, or the charging paper and jury instructions actually required the jury to find all the elements of generic burglary in order to convict the defendant." *Id.* at 602.

*Shepard*, decided two days before we heard oral argument in the present case, involved the same situation as *Taylor* except that the enhancing state burglary conviction resulted from the defendant's guilty plea rather than a conviction after trial. The Supreme Court held that "guilty pleas may establish ACCA predicate offenses and that *Taylor's* reasoning controls the identification of generic convictions following pleas, as well as convictions on verdicts, in States with nongeneric offenses." *Shepard*, 125 S. Ct. at 1259. It further "h[e]ld that enquiry under the ACCA to determine whether a plea of guilty to burglary defined by a non-generic statute necessarily admitted elements of the generic offense is limited to the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." *Id.* at 1263.

The inquiry under *Taylor*, regarding whether the state crime of burglary of which the defendant previously had been convicted constituted generic burglary, is straightforward and rather simple: whether the crime involved "unlawful or unprivileged entry into, or remaining in, a building or structure, with intent to commit a crime." *Taylor*, 495 U.S. at 599, *quoted in Shepard*, 125 S.Ct. at 1257. In most instances, there should be no difficulty making that determination based upon the charging documents. The inquiry under 18 U.S.C. § 2241(c) required in the present case is more complex. The comparison here is not between the state crime of burglary and the federal standard of generic burglary; instead it is between the detailed acts creating the specific child sexual abuse offense committed under the state law, and the detailed description of "sexual act" under the federal prohibition against engaging in a sexual act with a child. A district court may require greater flexibility in making the latter determination than adjudicating the burglary comparison. Because the trial court likely must determine very specific details of the defendant's prior state offense in order to make the comparison with the federal statutory definition of "sexual act," it may be necessary for

the court to consider more detailed records of the state criminal proceeding in the child sexual abuse context than in the burglary context. Thus, the somewhat narrow limitations imposed by *Taylor* and *Shepard* on what the sentencing court may consider in burglary cases might not be appropriate in applying the different statutory standards covering child sexual abuse.

We need not here determine the precise limits to the materials a sentencing court may consider in child sexual abuse cases, since we conclude that the materials that the district court relied upon in enhancing Kappell's sentence to life imprisonment were permissible and appropriate even under *Taylor* and *Shepard*. In determining that the state offense of which Kappell was convicted also would have been an offense under the federal statute, the district court had before it the state criminal complaint, a transcript of the state plea proceedings, and Kappell's acceptance in those proceedings of the factual statements in the complaint. We know of no convincing reason why the district court could not properly rely on those records in making its predicate offense determination. Indeed, the materials would satisfy the standards of *Taylor* and *Shepard* for determining whether a state burglary conviction constitutes generic burglary under the federal Act.

At oral argument, Kappell suggested that he, like Shepard, did not know, understand or accept the facts on which the state criminal complaint was based when he pleaded no contest to the state charge. *See Shepard*, 125 S. Ct. at 1258. The record of the state plea proceedings in Kappell's case refutes that claim.

In *Shepard*, the Supreme Court noted that "[i]n this particular pleaded case, the record is silent on the generic [burglary] element [which was in dispute], there being no plea agreement or recorded colloquy in which Shepard admitted the generic fact." *Shepard*, 125 S. Ct. at 1262. The Court stated that a sentencing judge's findings of fact on the disputed element would therefore be "too far removed from the conclusive significance of a prior judicial record[.]" *Id.*

In contrast, in Kappell's case the "prior judicial record" is anything but silent. The "facts contained in the complaint" not only were mentioned at Kappell's plea hearing, but Kappell agreed to them. The only reason the facts were not read into the record was that Kappell waived their reading. The relevant portion of the plea colloquy was as follows:

> The Court: Are you convinced, Mr. Haacke [Kappell's attorney], that [Kappell] understands this process today?
> Mr. Haacke: I believe he does.
> The Court: Do you want to read further the charge that he is going to be pleading to then and the facts of it?
> Mr. Haacke: We are probably willing to stipulate that the facts contained in the Complaint could act as a basis for the finding in this case.
> The Court: And he understands those facts?
> Mr. Haacke: I believe he does.
> The Court: Based upon his understanding, then the Court will accept the waiver of the reading and will then accept the change of plea from not guilty on count one to no contest.

Kappell, who was present and had previously directly answered several of the judge's questions, raised no issue about his lawyer's statements to the court or about the factual basis of the criminal charge against him. "Where a defendant is represented by competent counsel, the court usually may rely on that counsel's assurance that the defendant has been properly informed of the nature and elements of the charge to which he is pleading guilty." *Bradshaw v. Stumpf*, ____ U.S. ____, 125 S. Ct. 2398, 2406 (2005). Although Kappell now contends that his admission of the facts in the case should not be credited because it was made in connection with a plea of no contest rather than guilty, this Court has rejected that claim, having stated that for purposes of determining which judicial records a sentencing court may properly consider under *Taylor*, a plea of nolo contendere "has a similar legal effect as pleading guilty." *United States v. Arnold*, 58 F.3d 1117, 1124 n.5 (6th Cir. 1995).

*United States v. Etimani*, 328 F.3d 493 (9th Cir. 2003), upon which the district court here relied, is not inconsistent with our conclusion and in fact supports it. *Etimani* also involved a sentencing enhancement issue under 18 U.S.C. § 2241(c). Etimani had a previous California state conviction for "lewd and lascivious conduct upon a child" pursuant to a plea of no contest. *Etimani*, 328 F.3d at 502. The California statute was broader than § 2241(c) because it covered not only improper skin-to-skin sexual touching of a child, but also such touching through clothing. *Id.*

The district court refused to impose a life sentence because it could not tell from the material before it whether the California conviction was for conduct that violated § 2241(c). The Ninth Circuit affirmed that ruling on the ground that "it is not possible to tell, solely by reading the Information in tandem with the judgment of conviction, whether Etimani was convicted of the 'sexual act' [skin-to-skin contact] or 'sexual contact' [through clothing] species of the offense." *Id.* at 504. It then stated:

> Had the Information charged skin-to-skin contact, a no-contest or guilty plea to the crime as charged would have removed the ambiguity, but that is not the case here. Likewise, if Etimani's conviction had derived from a jury verdict, it might have been possible to discern what acts Etimani was found to have committed by examining the form-of-verdict along with the jury instructions. Read together, the verdict and the instructions might have shown what the jury necessarily found, but that is not the situation here, either. Sometimes, plea agreements contain a written statement of the factual basis for the plea, but that, too, is not what we have. As the district judge noted, a transcript of Etimani's plea of no-contest might have clarified the exact nature of his prior conviction, but none was provided. Under these circumstances, the district court correctly ruled that the government failed to establish that the California prior conviction qualified as predicate offense for purposes of § 2241(c).

*Id.* (emphasis omitted). As this statement indicates, there is little doubt that the *Etimani* court, if it had before it the record in the present case, would uphold the district court's imposition of a life sentence on Kappell.

CONCLUSION

Kappell's conviction and sentence are affirmed.